UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES VERA, : | |
|     Plaintiff, : | |
| : | |
| v. : | 3:10-cv-01417-WWE |
| : | |
| WATERBURY HOSPITAL, : | |
|     Defendant. : | |

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff James Vera filed this eight count action against defendant Waterbury Hospital alleging disability and sexual orientation discrimination. Counts two and eight have been dismissed. Defendant now moves for summary judgment on the six remaining counts, which allege violation of: (1) the Family Medical Leave Act ("FMLA"); (3) the Americans with Disabilities Act of 1990; (4) the Rehabilitation Act of 1973 ("Rehab Act"); (5) the Connecticut Fair Employment Practices Act ("CFEPA"); (6) Conn. Gen. Stat. § 46a-81c (sexual orientation discrimination); and (7) Connecticut's common law with reference to intentional infliction of emotional distress. For the following reasons, defendant's motion for summary judgment will be granted.

## BACKGROUND

Plaintiff James Vera is a homosexual, white male. He was employed by defendant Waterbury Hospital from April 15, 2002, to August 7, 2009. Plaintiff began his employment with defendant as a respiratory therapist on the third shift, which ran from either 7:00 p.m. to 7:00 a.m. or 11:00 p.m. to 7:00 a.m. Beginning on or about October 19, 2003, he worked as a polysomnographic specialist, hereinafter referred to as a "sleep tech," also on the third shift (7:00 p.m. to 7:00 a.m.). All sleep techs are required to work the third shift.

Sleep techs oversee and monitor the sleep studies conducted at defendant's Sleep Lab when patients are sleeping. A sleep study records many aspects of sleep, including breathing patterns, snoring, heartbeat, oxygen levels, leg movements, brain waves and total sleep quality. Testing begins in the early evening when the sleep tech applies the monitor leads to the patient and explains the process to the patient. The sleep tech continues to monitor the patient while he or she is sleeping and follows the testing through the night in the control room next to the bedrooms.

Defendant asserts that the sleep tech position is necessarily a night-shift position, but plaintiff contends that sleep techs may be trained to work the day-shift as "scorers." Scorers work the day shift from 8:00 a.m. to 4:30 p.m. One of their primary responsibilities is to score the sleep studies conducted by the sleep techs on the night shift. Scorers require more training than general sleep techs.

From January 2008 to May 2012, there have been no vacant scorer positions, and plaintiff admits that he has not been trained or certified to be a scorer.

**Plaintiff's Alleged Disability**

Plaintiff asserts that he suffers from "heart disease" which he claims is based on a preliminary diagnosis of "hypertrophic cardiomyopathy" and a second diagnosis of "hyperdynamic left ventricle with characteristics of hypertrophic cardiomyopathy."

According to plaintiff's testimony, in 2008, his doctors, Dr. Mark Schoenfeld and Dr. Joseph P. Morley, thought that plaintiff suffered from hypertrophic cardiomyopathy. Plaintiff subsequently contacted Dr. Martin Maron to get a second opinion. Plaintiff testified that Dr. Maron could not understand how hypertrophic cardiomyopathy could be diagnosed without an

MRI or stress echocardiogram, neither of which had been performed on plaintiff.

Plaintiff then went to see another cardiologist, Dr. Assad Rizvi. Dr. Rizvi directed that an MRI be taken of plaintiff's heart and that plaintiff undergo a stress echocardiogram. Plaintiff testified that Dr. Rizvi concluded that plaintiff did not exhibit all of the characteristics of hypertrophic cardiomyopathy, but instead had hyperdynamic left ventricle with characteristics of hypertrophic cardiomyopathy. After plaintiff started treatment with Dr. Rizvi, he did not return to Dr. Morley or Dr. Schoenfeld.

Plaintiff testified that there are no symtoms of hypertrophic cardiomyopathy, but there are symtoms of hyperdynamic left ventricle. Plaintiff's symptoms include the sensation of his heart racing and skipping a beat, shortness of breath, a "black curtain felling of going to pass out" and passing out.

With respect to shortness of breath, plaintiff remembers only one specific episode where he suffered from shortness of breath while working at the hospital. At other times, plaintiff would feel short of breath while climbing stairs.

Plaintiff describes the black curtain sensation as feeling as if he's going to pass out. He testified that he experienced the sensation about half a dozen times, or once a year, from 2002 to 2008. Plaintiff testified that he only actually passed out, or lost consciousness, on at most three occasions. The first time was in February 2008 at his home. After sprinting up the stairs, plaintiff sat on the edge of his bed before passing out. Earlier that day, plaintiff consumed a large quantity of caffeine and smoked marijuana. Plaintiff thinks he may have passed out a second time in May 2009 while sitting in his chair at the Sleep Lab but isn't certain that he did not simply fall asleep.

Plaintiff has not disclosed any expert witnesses, medical or otherwise.

**Leave of Absence**

On May 21, 2009, plaintiff began a leave of absence from the Hospital.  One week into the absence, plaintiff saw his primary care physician, Dr. Jose Orellana, who gave plaintiff a note stating that plaintiff would be out of work from May 21, 2009, to July 20, 2009.  On August 5, 2009, Dr. Orellana prepared a note stating, in part, that "James M. Vera has been physically and mentally available to work full time since June 15, 2009.  The only restriction for work is that he may not work a night shift job."

Plaintiff testified that since 2002 he has been able to care for, feed, bathe, and cook a meal for himself, as well as brush his teeth, shop for clothes, drive a car, and do laundry.  Since his last day worked at defendant Hospital on May 20, 2009, plaintiff has not worked another night shift at any subsequent place of employment.  However, he testified that from October 2011 to December 2011, more than two years after he stopped working a night shift, he would frequently feel like his heart was racing and skipping a beat after climbing stairs.  On December 28, 2011, plaintiff's heart started racing so fast that he called an ambulance and went to the hospital.

Plaintiff first called in sick on May 21, 2009.  By letter dated May 31, 2009, defendant notified plaintiff of the process that must be followed in order to apply for FMLA and/or disability leave.  Application needed to be made through UNUM Life Insurance Company of America ("UNUM"), which was the third-party disability administrator for all medical short-term, long-term, and family medical leaves of absences for defendant's employees.

Plaintiff applied for short-term disability with UNUM, but did not apply for leave of

absence pursuant to the FMLA.  UNUM sent plaintiff a letter dated June 26, 2009, stating that it was unable to approve his request for short-term disability benefits because the disability was "not supported by medical documentation."  UNUM advised that it would reconsider plaintiff's claim if he or his physician provided additional information in support of plaintiff's request.  UNUM further advised that he could submit a written appeal.

Plaintiff testified that he does not recall submitting any additional documentation in support of his request for short term disability benefits after receiving UNUM's rejection letter.  Plaintiff received another letter from UNUM, dated July 24, 2009, reiterating that plaintiff could submit a written appeal.  Plaintiff decided not to appeal the decision.

**Request for Accommodation**

Plaintiff testified that he had requested to be taken off the night shift sometime between April and June of 2008 and again in April of 2009.  Although plaintiff conducted his own research by looking at defendant's job board and online postings, neither he nor defendant were able to find any vacant daytime positions for which he could apply.  Meanwhile, plaintiff's supervisors were supportive of him and encouraged him to apply for FMLA leave or any other type of leave if he felt he needed to take time off to get better.

Plaintiff testified that after he commenced his leave of absence on May 21, 2009, he continued to look actively for other vacant positions involving pulmonary function testing and for positions in the cardiac rehabilitation department, but his searches revealed no vacant positions.

Notwithstanding plaintiff's decision against applying for FMLA leave or appealing his short term disability denial, defendant held open his position for seventy-eight (78) days, from

May 21, 2009, to August 7, 2009. Defendant offered plaintiff the option of returning to his former position under the same terms and conditions, but plaintiff elected not to return.

Defendant sent plaintiff a letter advising plaintiff that failure to return to work from an unapproved leave of absence would result in his voluntary resignation. Plaintiff did not respond to defendant's letter or return to work.

### Sexual Orientation Discrimination

Plaintiff alleges and defendant denies that plaintiff was forced to endure continual insulting comments about his partner and their relationship during the course of his employment. Plaintiff alleges that fellow employees frequently called plaintiff "one of the girls" and asked him if it was "his time of the month." Coworkers also referred to plaintiff's partner as his "friend" or "little friend." Finally, a colleague allegedly read the Bible "at" plaintiff and told him that his way of life was a sin.

### CHRO

The Connecticut Commission on Human Rights and Opportunities dismissed plaintiff's complaint with them on the ground that there was no reasonable possibility that investigating the complaint would result in a finding of reasonable cause.

## DISCUSSION

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a

reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.  The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him.  See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party.  See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**Family Medical Leave Act**

To establish a *prima facie* case of FMLA retaliation, a plaintiff must demonstrate that: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under

7

circumstances giving rise to an inference of retaliatory intent." Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). Here, although plaintiff's complaint alleged that he filed a request for FMLA leave, he has since recanted. As plaintiff failed to apply for FMLA leave, he cannot satisfy the first prong of the retaliation claim. Likewise, there is no evidence that defendant interfered with plaintiff's FMLA rights. Indeed, plaintiff's supervisors encouraged him to apply for FMLA leave. Accordingly, summary judgment will be granted in favor of defendant on the FMLA retaliation claim.

**Disability Discrimination under the ADA and the Rehab Act**

Discrimination claims in reasonable accommodation cases, such as this one, require that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." Graves v. Finch Pruyn & Co., Inc. 457 F.3d 181, 184 (2d Cir. 2006).

As plaintiff declined to disclose any experts, it is unlikely that he would be able to prove his disability to a jury. Any explanation concerning the effect of hyperdynamic left ventricle with characteristics of hypertrophic cardiomyopathy is likely to be beyond the understanding of the lay person. Furthermore, plaintiff has not shown how his impairment substantially limits a major life activity. Nevertheless, it is unnecessary to decide the issue of disability where, as here, plaintiff has not demonstrated the existence of some accommodation for which he was qualified.

Here, plaintiff sought the accommodation of working a daytime shift. However, plaintiff has not demonstrated that defendant had a vacant, daytime position for which plaintiff was

8

qualified. Jeffrey Dill, the Assistant Director of the Sleep Lab testified that defendant did not have a vacant scorer position available when plaintiff was interested in moving to the day-shift. Mr. Dill also testified that plaintiff lacked the training and skills to be a scorer.

Based on Mr. Dill's affidavit, defendant's Rule 56 Statement of Material facts stated at fact paragraph #17: "From January 2008 through the present there have been no vacant Scorer positions for hire. Further, the plaintiff testified that he has not been trained to be a sleep Scorer. Pl's Dep. at 171; *Dill Aff.* ¶ 9, 11."

In his denial of fact paragraph #17, plaintiff maintains that he requested training as a scorer, and that it could readily have been done. However, plaintiff has provided no evidentiary support for his assertion that a vacant scorer position existed.

The Second Circuit has held that in ADA reasonable accommodation cases, "[t]he plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment, including the existence of a vacant position for which she is qualified." McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92, 97 (2d Cir. 2009). Similarly, with regard to Rehab Act accommodation cases, "a plaintiff bears the burden of establishing that a vacancy existed into which he or she might have been transferred." Jackan v. New York State Dept. of Labor, 205 F.3d 562, 566 (2d Cir. 2000).

As plaintiff has failed to demonstrate that there existed any potential accommodation that would have allowed him work the day-shift, his reasonable accommodation disability discrimination claims fail. Accordingly, summary judgment will be granted in defendant's favor on plaintiff's ADA and Rehab Act claims.

**Disability Discrimination under CFEPA**

To establish a *prima facie* case of disability discrimination under CFEPA, plaintiff must show: "(1) he [was] in the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination."  Jackson v. Water Pollution Control Authority of City of Bridgeport, 278 Conn. 692, 707 (2006).  Under CFEPA, "disabled" refers to any individual who has any chronic physical handicap, infirmity or impairment.  Conn. Gen. Stat. § 46a-51(15).

Assuming *arguendo* that plaintiff is disabled for purposes of CFEPA, he has not demonstrated that his termination occurred under circumstances that give rise to an inference of discrimination.  Although encouraged by his supervisors to apply for appropriate leave, either by applying for FLMA leave or submitting medical evidence to substantiate his short-term disability leave, plaintiff declined.  Plaintiff was terminated via "voluntary resignation" when he neither responded to requests to seek authorized leave nor returned to work.

Plaintiff hasn't demonstrated evidence giving rise to an inference of disability discrimination.  Accordingly, summary judgment will be granted in defendant's favor on plaintiff's CFEPA claim.

**Sexual Orientation Discrimination**

Connecticut General Statute § 46a-81c prohibits employers from discharging or discriminating against employees "in compensation or in terms, conditions or privileges of employment because of an individual's sexual orientation or civil union status."  Conn. Gen. Stat. § 46a-81c.

"To prevail on a hostile work environment claim, a plaintiff must demonstrate: "(1) that

10

[his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). Whether conduct was so severe or pervasive as to create a hostile work environment depends on the totality of the circumstances, including such factors as the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, or merely offensive, and whether it unreasonably interfered with the employee's work performance. Harris v. Forklift Systems, Inc., 510, U.S. 17, 23 (1993). The conduct alleged must be severe and pervasive enough to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive." Schwapp, 118 F.3d at 110.

Here, although the alleged comments were offensive, they were not physically threatening, and plaintiff has not demonstrated that the comments interfered with his work performance.

It is unlikely that plaintiff's allegations amount to the "steady barrage" of outrageous comments required to establish a hostile work environment. Id. More importantly, any comment that occurred before July 29, 2009, is time barred because it occurred beyond the 180 day statute of limitations. See Conn. Gen. Stat. § 46a-82(f). Indeed, plaintiff's last day of work was May 20, 2009, *before* the 180 day deadline.

Plaintiff has alleged that a coworker told him sometime after July 29, 2009, that he and his "little friend" needed to return to work. Further, plaintiff argues that the 180 day time-bar is not meant to apply to continuing violations. While courts have held that the limit is not meant to bar claims based on continuous and ongoing practice of discrimination, pursuant to a policy of

discrimination, plaintiff has failed to demonstrate "specific ongoing discriminatory policies or practices . . ." Cornwell v. Robinson, 23 F.3d 694, 704 (1994). The continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination.  See Fitzgerald v. Henderson, 251 F.3d 345, 359 (2001).

Based on the totality of the circumstances defendant's conduct was not so severe or pervasive as to create a hostile work environment or to evince an underlying policy of discrimination. Therefore, defendant's motion for summary judgment will be granted as to plaintiff's hostile work environment claim.

Plaintiff has also failed to demonstrate a *prima facie* case of discrimination based on sexual orientation based on an adverse employment action.  To do so, plaintiff must show that: "(1) [he] is a member of a protected class; (2) [he] was qualified for the position; (3) [he] experienced an adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discriminatory intent."

Here, the alleged adverse employment action, plaintiff's termination, was based on plaintiff's refusal to return to work.  No reasonable jury could find that defendant terminated plaintiff's employment based on his homosexuality when defendant offered to help plaintiff apply for leave and asked him to come back to work after seventy-eight days of absence. Accordingly, summary judgment will be granted in favor of defendant on plaintiff's sexual orientation discrimination claim.

**Intentional Infliction of Emotional Distress**

To establish a claim for intentional infliction of emotional distress, a plaintiff must demonstrate: "(1) that the actor intended to inflict emotional distress or that he knew or should

have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Board of Educ. of Town of Stonington, 254 Conn. 205, 210 (2000).

Here, plaintiff has failed to make a sufficient showing that defendants' conduct was extreme and outrageous, an essential element of his case for which he has the burden of proof. "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." Id. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 210-211.

Here, the comments by plaintiff's co-workers, as alleged, were inappropriate. However, "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id. at 1062. Although the alleged comments were offensive, they were not physically threatening, and plaintiff has not demonstrated that the comments interfered with his work performance. Accordingly, summary judgment will be granted in defendant's favor on the intentional infliction of emotional distress claim.

## **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment [Doc. #36] is GRANTED.  The Clerk is instructed to close this case.

Dated this 28th day of March, 2013, at Bridgeport, Connecticut.


_____/s/_____
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE